8763.   JACKSON *v.* FREEMAN, receiver.

On the trial of an action by which the receiver of an insolvent national bank sought to collect from the defendant, as owner of certain stock in the bank, an assessment for payment of debts of the bank, and to which the defendant pleaded that he was not the owner of the stock, the following facts appeared from uncontradicted evidence: Before the bank became insolvent the defendant sold this stock, received the purchase price, and delivered to the purchaser the stock-certificate, with a duly executed power of attorney in blank on the back of the certificate, to be filled in by the latter, the blank being left because the purchaser stated that his wife might want it in her name and he requested an opportunity to consult her and see whether he wanted it put in her name or not. The person who thus purchased the stock as an individual was

the cashier of the bank, and had charge of its stock-book, and was the officer whose duty it was to make all transfers of stock on its books, and the defendant, on delivery of the certificate, directed him, as cashier, to transfer this stock on the books, and he promised to do so. He testified that whatever transfer was made was "to be made at once, completed at once." He neglected to make the transfer on the books, and the certificate, with the power of attorney in blank, remained in his possession. The defendant did not know or suspect until after the bank had become insolvent that the transfer had not been made on the books, and at the time of the sale of the stock he had no knowledge or intimation that the bank was insolvent or in a failing condition. *Held:* Under the facts in evidence, the defendant was not subject to the assessment, and the court erred in directing a verdict against him.

DECIDED AUGUST 3, 1917.

Action on stock assessment; from Walker superior court—Judge Wright. February 22, 1917.

This was a suit by the receiver of a national bank to collect an assessment on the capital stock of the bank, it being alleged that at the time of the appointment of the receiver it appeared on the books of the bank that the defendant was the holder of a certain number of shares of its capital stock; that the comptroller of the currency, in order to pay the debts of the bank, ordered an assessment on all its shareholders of $75 for each share of the capital stock owned by them, and that the receiver had given the defendant timely written notice of the levy of the assessment. The defendant refused to pay the assessment, denying that he was the owner of the stock which stood in his name on the books of the bank. On the trial it appeared, from undisputed testimony, that the defendant had been the holder of a certificate representing ten shares of the capital stock of the bank, and that prior to two months before the appointment of a receiver for the bank he sold and delivered this certificate to S. A. Hunt Jr., the cashier of the bank; that though this sale was to Hunt in his private capacity, Hunt, at the time of the sale and delivery, was requested, as cashier of the bank, to transfer the certificate upon the books of the bank, but that this transfer had never been made; and that at the time of the sale the defendant had no reason to believe that the bank was insolvent, or was about to become so.

*Earl Jackson, R. M. W. Glenn, Maddox & Doyal,* for plaintiff in error, cited: 7 Corpus Juris, 771, 772; Whitney v. Butler, 118 U. S. 655; Earle v. Carson, 107 Fed. 639 (46 C. C. A. 498, 60 60 L. R. A. 266), aff. 188 U. S. 42; Snyder v. Foster, 73 Fed. 136,

142, 143 (19 C. C. A. 406); Young *v.* McKay, .50 Fed. 394; Hayes *v.* Shoemaker, 39 Fed. 912; Matteson *v.* Dent, 176 U. S. 521, 531; Briggs *v.* Spaulding, 141 U. S. 132; McDonald *v.* Dewey, 134 Fed. 528 (67 C. C. A. 408); 202 U. S. 510, 520, 521; Earle *v.* Coyle, 95 Fed. 99, aff. 97 Fed. 410 (38 C. C. A. 226); Hayes *v.* Yawger, 39 Fed. 912; Cox *v.* Elmendorf, 97 Tenn. 518 (37 S. W. 387); Foster *v.* Bross, 120 Mich. 1 (79 N. W. 696); Fowler *v.* Crouse, 175 Fed. 646 (99 C. C. A. 200); 202 U. S. 510; Vander-griff *v.* Rich Hill Bank, 163 Fed 823 (90 C. C. A. 129); Kimball *v.* Apsey, 164 Fed. 830; Rev. Stat. U. S., § 5139; Richmond *v.* Irons, 121 U. S. 27.

*Rosser & Shaw,* contra, cited: Freeman v. Jackson, 146 *Ga.* 55 (90 S. E. 467); Simmons v. Freeman, 146 *Ga.* 118 (90 S. E. 965).

BROYLES, P. J.   (After stating the foregoing facts.)   When this case was before the Supreme Court (*Freeman* v. *Jackson,* 146 *Ga.* 55, 90 S. E. 467), under the evidence as disclosed by the record it was held that the direction of a verdict for the defendant was erroneous.   We have carefully examined the original record on file in the office of the clerk of the Supreme Court, and we find that in several material respects the evidence contained in that record is different from that contained in the record now before this court. In the record before the Supreme Court the only evidence as to who was the proper bank official to transfer stock on the books of the bank was the following testimony of Jackson, the defendant, and Hunt, the cashier of the bank, respectively.   Jackson testified: "I thought Mr. Hunt was the proper party to transfer the stock on the books of the bank. I thought so·at the time and I think so yet."   Hunt, the cashier, upon this question gave the following testimony: "It was the duty of the cashier and president, or vice-president, in the absence of the president, to transfer stock when sold. . . It was the president's and the cashier's duty to transfer stock on the books of the bank. New stock would have to be issued and necessarily have to be signed by the cashier and the president."   Moreover, the evidence in the Supreme Court record did not definitely show that when Jackson delivered the certificate of stock to Hunt, the purchaser, *Hunt was directed, as the cashier of the bank,* to make the transfer upon the books of the bank.   The only evidence on that question was the following testimony of Jackson:   "I delivered the certificate to Mr. S. A. Hunt, the pur-

49

chaser, who was then the cashier of the bank, and told him to trans-
fer it on the bank books."

In the record in the instant case the testimony upon these points
was as follows: Thurman, the bookkeeper of the bank, testified:
"When transfers of stock were made, it was Mr. Hunt's duty to
make those transfers. I mean S. A. Hunt Jr., who at the time was
cashier of the First National Bank of LaFayette." S. A. Hunt
Jr. testified, that he was acting as cashier of the bank at the time
it was closed by the bank-examiner; that he had been serving in
that capacity about ten years; also: "It was a part of my duties
to look after the transfer of stock on the books of the bank."
"Some time prior to the closing of the bank I purchased ten shares
of stock from Mr. T. A. Jackson, represented by one of the certif-
icates shown on the books of the bank. The date of that pur-
chase was April 29, 1913; that was nearly two months prior to the
closing of the bank. I paid him in cash for that stock, and he de-
livered the certificate to me and signed the transfer in blank. That
is the form of the transfer that was on the back of that certificate,
and it was signed by T. A. Jackson, and that stock certificate was
delivered to me, and I paid him in cash for it, and, at the same time
he delivered it to me, he made a request of me, as the cashier of the
First National Bank of LaFayette, to transfer that stock on the
books of the bank, and at that time Mr. Jackson made a request of
me, as the cashier of the bank, to transfer that stock on the books
of the bank. It was my duty, as cashier of the bank, to make those
transfers, and, as cashier, I had charge of and kept these stock-
books, and all the transfers of stock that were made were made
and signed by me, as cashier of the bank. That stock was never
transferred on the books,—this particular ten shares of stock that
I purchased from Mr. Jackson. I guess it was my fault. It came
about in this manner: Mr. Jackson and myself had been on a
trade for several days about this stock, and when he started to
transfer the stock, he started to write my name in it, and I told
him that probably my wife might want it in her name, and to
wait until I could see about that, and I put the stock certificate in
my pocket, and the next day I changed clothes and the stock cer-
tificate was left in my pocket, and my wife took the papers out and
put them in my trunk, and it just escaped my memory. It was
through an inadvertence of mine that the transfer was not made,

and through no fault of Mr. Jackson. I didn't tell Mr. Jackson that the transfer had not been made,—never thought of it; didn't come to my attention until after the bank was closed. Frequently in the transfer.of stock it is merely signed in blank. It frequently happens in banks, as well as in other corporations, that stock is not immediately transferred where sold by one party to another; in the form of the assignment the person to whom it is assigned is not put in there. All the bank demanded was the signature of the person in whose name the stock certificate was standing, and I did not require the name of the person to whom it was transferred; that was frequently left blank. That was a bona fide transfer between myself and Mr. Jackson as to the sale of this stock. . . At the time I received the stock certificate it was purposely left blank, because I did not know at that time whether my wife would become the purchaser or me. He started to write my name, and the certificate will show how he put the letter 'S' there, and I stopped him. . . Mr. Jackson had nothing to do with any of the books of the bank, and at the time he delivered the stock to me he gave it to me and says, 'You can make the transfer,'—says 'I will leave that blank, and you can make the transfer on the books;' and I told him I would make the transfer, but before doing so I merely requested an opportunity to consult my wife and see whether I wanted to put it in her name or not, but the transfer was to be made at once, completed at once; and Mr. Jackson at that time told me that I could fill in there whichever name I wanted to, and make the transfer accordingly. Mr. Jackson just stated to me, 'When you determine that, you can make the transfer.'" The defendant, Jackson, substantially corroborated the above evidence of Hunt, the cashier, and testified: "When I was discussing the question of the transfer of the stock with Mr. Hunt I told him, as cashier of the bank, to do that. He had been making all those transfers. He was the proper person to do that. . . I had no knowledge, or intimation, or suspicion that the transfer had not been made on the books of the bank, not until after the bank was closed."

In the case made by the record before the Supreme Court that court decided that it did not come within the ruling in the case of Whitney v. Butler, 118 U. S. 655 (7 Sup. Ct. 61, 30 L. ed. 266), which was as follows: "A, an owner of shares in the capital stock

of a national bank, employed a broker and auctioneer to sell them by public auction. They were bid off by B, who paid the auctioneer for them, and received from him the certificate of stock, with a power of attorney for transfer duly executed in blank. The auctioneer paid the purchase-money to A. B was employed by the president of the bank to make this purchase for a customer of the bank, who had made a deposit in the bank for the purpose, and he delivered the certificate and the power of attorney to the president, and received from the bank the money for the purchase. No formal transfer of the stock was made on the transfer-book of the bank. Shortly afterwards the bank became insolvent, and eventually went into the hands of a receiver, who made an assessment on the stockholders under the provisions of Rev. Stat. § 5205 [U. S. Comp. St. 1913, § 9767], to make up the deficiency in the capital. Until after the stoppage A had no knowledge as to the purchaser, or as to the neglect to formally transfer the stock, and no reason to suppose that the transfer had not been made." And it was there held, that "the responsibility of A ceased upon the surrender of the certificate to the bank, and the delivery to its president of a power of attorney sufficient to effect, and intended to effect, as the president knew, a transfer of the stock on the books of the bank."

In our judgment, however, the facts as disclosed by the record now before this court bring this case, in principle, up to the case referred to. In that case the certificate was surrendered to the president of the bank, accompanied by a power of attorney, which would have enabled the officers of the bank to make the transfer on the books, and a demand that this be done. In the instant case the certificate was delivered to the cashier of the bank by the shareholder in person, and accordingly no power of attorney was needed, as the shareholder signed the transfer which was on the back of the certificate, and expressly authorized the cashier of the bank to write the name of the purchaser in the space left blank in the transfer for that purpose, and furthermore the cashier had authority, and was expressly directed, to transfer this certificate upon the books of the bank. In the Whitney case the stock was bought, not for the bank itself, but for a customer of the bank. In the instant case, likewise, the stock was not bought for the bank, but was bought by the cashier thereof for himself individually. In both cases the stock certificate was delivered to an officer of the

bank, and it was so signed and arranged that he had the power and authority to fill in the name of the purchaser in the certificate, and to transfer the certificate upon the books of the bank. In both cases, at the time of the delivery of the stock to the bank official, he was requested as such official to make the proper transfer of the stock upon the books. In both cases the seller of the stock had made a bona fide sale of it and had done all that could be reasonably required of him to see that the proper transfer was made upon the books of the bank. In neither case did the defendant have any "reason to suppose that the transfer had not been made." In the instant case the certificate was delivered to Hunt in his dual capacity as its purchaser and as cashier of the bank, and at the time of the delivery he, as cashier of the bank, was instructed to transfer the stock upon the books of the bank, and as cashier of the bank he promised to do so. In our opinion the certificate was, in contemplation of law, delivered to the bank itself when it was delivered to Hunt, accompanied by the instruction to transfer it, as cashier of the bank, upon the books of the bank. The undisputed evidence was that Hunt was the only officer of the bank whose duty it was to make such transfers. It seems to us that Jackson, like the defendants in the Whitney case, supra, had done all that he could to have the transfer put upon the books of the bank, and that his responsibility ceased upon the surrender of the certificate to the bank through Hunt, its cashier, accompanied with the demand that Hunt, as cashier of the bank, transfer the stock upon the books of the bank.

Upon the second trial of this case there was no uncertainty, as the Supreme Court intimated there was upon the first trial, as to what person had purchased the stock from Jackson, and as to whose name it should have been transferred in. The undisputed evidence in the record before us is that Hunt, and not Mrs. Hunt, had bought and paid for the stock, and that the stock was delivered to Hunt himself, and that Hunt, as the cashier of the bank, was officially instructed to enter the transfer of the stock upon the bank's books, and that it was his duty to do so immediately. Hunt had authority, and contracted with Jackson, to fill in the blank in the transfer certificate, by entering therein either his name or that of Mrs. Hunt. The uncontradicted testimony was that it was Hunt's duty, and not Jackson's, to see that this was done.

The undisputed evidence was that the sale of this stock was a bona fide and unconditional sale to Hunt. Mrs. Hunt was not a party to the purchase and was not known in the transaction. The mere fact that Hunt stopped Jackson from writing his (Hunt's) name in the transfer, stating that he wanted to wait until he could see his wife and find out whether she wanted the stock put in her name, is insufficient, when taken in connection with all the other facts of the transaction, to relieve Hunt from the duty of making the transfer on the bank's books, or to make Jackson liable for Hunt's negligence. The record further disclosing that Hunt's wife did not request that the stock be put in her name, Hunt should have filled in the blank with his own name, he being the purchaser of the stock, and should have promptly put the transfer upon the books. He was the bona fide holder and owner of the stock, and, although he bought the stock personally, he had simultaneously been instructed, as cashier of the bank, to transfer it on the books of the bank, and, since he was the only officer of the bank whose duty it was to make such transfer, he, as such officer, knew that he himself, and not his wife, had bought the stock, and he therefore officially knew that it should be transferred to him. on the books, and not to his wife, and he knew this at the time he was instructed to transfer the stock.

We are clearly of the opinion that Hunt was the person liable for the assessment on this stock, and not Jackson. It therefore follows that the court erred in directing a verdict for the plaintiff.

*Judgment reversed. Jenkins and Bloodworth, JJ., concur.*